BRITTLE *v.* THE PEOPLE.

## Brittle v. The People.

THE CONSTITUTION.  *The history* of the formation and adoption of the constitution of the State of Nebraska stated.

——: *Jurisdiction to determine its adoption.*  The question, whether a State constitution was regularly and legally adopted after the same has been acted upon, and the State government is, in fact, being administered under it, is a political rather than a judicial question.  A court organized under a constitution would be *felo de se* if it should declare such constitution null for irregularity and illegality in its adoption.

——: *Amendments by Congress.*  When a constitution has been adopted by the people of a Territory preparatory to admission as a State, and Congress prescribes certain changes and additions to be adopted by the legislature as part of the constitution, and such changes and additions are declared to be fundamental conditions of the admission of the State, and the legislature accept such changes, additions, and conditions, and the State is thus admitted, they become thereby a part of the constitution, and binding as such, although not submitted to the people for their approval.

ADMISSION INTO THE UNION.  *Congress* is vested with the sole power of admitting new States into the Union.

A COLORED MAN *has the right to sit on a jury* under the constitution of the State of Nebraska.

This was a writ of error to the District Court of Douglas County.  The plaintiff in error was indicted in that Court for burglary ; and the plea of not guilty was put in by him.  The cause having been moved for trial, the names of persons summoned on the regular panel were called, and among them that of Howard W. Crossley, who was a colored man ; for which sole reason the defendant challenged him as not competent to sit on a jury.  The Court overruled the objection.

BRITTLE v. THE PEOPLE.

The trial resulted in a verdict of guilty. Motions for a new trial and in arrest of judgment were overruled ; and judgment was entered, and sentence pronounced. The ruling upon the challenge of the colored juror is assigned for error.

*R. Townsend,* for plaintiff in error.

I. All free *white* males otherwise qualified, and none others, are competent jurors in this State. *Revised Statutes of Nebraska,* p. 509, sects. 657, 658.

The above statute is not in conflict with the National Constitution. The Thirteenth Amendment to that instrument simply abolished slavery ; the Fourteenth Amendment defined citizenship, and secured civil rights to *all* citizens ; the Fifteenth Amendment prohibits any distinction on account of color in the matter of the *elective franchise.*

Negroes are not competent jurors on the mere ground of citizenship. The Fourteenth Amendment makes *all persons* born or naturalized in the United States citizens thereof, and of the State wherein they reside. (See first section of Fourteenth Amendment.) All infants and all women, black as well as white, born or naturalized in the United States, are citizens thereof, and of the State wherein they reside ; but it is not pretended that *their* citizenship gives *them* the right to vote or hold office, or makes *them* competent jurors. See *Webster's Dictionary* for definition of word " person."

And the second section of the Fourteenth Amendment clearly implies that the rights guaranteed by said first section are only such rights as are in their nature fundamental, — the natural rights of persons as defined by Blackstone, — the right of personal liberty, the right of personal security, the right of private property. For

said second section admits the power of States to deny or abridge the elective franchise ; and, if not potent enough to invest with *that* coveted boon, how can it be said that this Fourteenth Amendment had the mystic power to regulate the less important matter of the competency of jurors ?

Sect. 2, article 4, United-States Constitution : " The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." Under this provision, it has been decided that the *privileges* and *immunities* secured " are only such as are in their nature fundamental." 4 *Washington Circuit Court Reports,* 371 ; 18 *How. U. S.*, 591.

Fundamental rights belong to the black boy or girl, the white boy or girl, the black woman and the white woman, as well as to the black male adult. That it was the object of sect. 1, Amendment XIV., simply to secure *such* rights to all these persons, is evident from contemporaneous history. Although Amendment XIII. had abolished slavery, yet, under the Dred-Scott decision, many States denied to free persons of color the right to sue or be sued, to make contracts, or to hold property. And this section of Amendment XIV. was passed to avoid the Dred-Scott decision, and secure these natural rights to the negro, male and female, infant and adult. *Dred Scott* v. *Sanford,* 19 *How. U. S. R.*, 393 ; and see pp. 4, 6, 13, and 22, of the *Report of the Joint Committee on Reconstruction made to Congress in the Year* 1866.

II. Service as a juror is not a personal right. It is a duty, service, or liability, for the non-performance of which a *penalty* is imposed. *Revised Statutes of Nebraska,* p. 511, sect. 667. No penalty is ever imposed for the failure to exercise an absolute personal right ; as, for instance, fining a citizen for not suing out a writ

of *habeas corpus,* or for not bringing any ordinary private action.

III. The elective franchise, as guaranteed by the Fifteenth Amendment, is not the test as to qualifications of jurors. All the States have, from their origin, applied other tests; such as property qualifications, age, sound mind, and discretion, &c. As the jury law of Nebraska now stands, the county commissioners have a large discretion as to whom they shall place on the jury lists. But *query :* If the legislature can confer such discretion on the county commissioners, can it not exercise such discretion itself, and exclude any person, or class of persons, whom it may deem not of sufficient discretion? And *query :* If the exercise of such discretion by the legislature be unconstitutional, is not the exercise of the like discretion by the county commissioners equally obnoxious? And *query :* If the elective franchise invests with the " right " to serve as a juror, what power has the legislature to affix other qualifications? Strict personal rights are enjoyed without qualifications as to *age, sex, bodily disability,* or *sound discretion.*

And again : every *right* admits of a *remedy* for its denial. But where is the remedy to compel the county commissioners to place A B's name on their jury-list? The remedy is not in the courts : it can be had only at the ballot-box, the sole medium (aside from special statute relief) for correcting evils not amounting to the violation of strict personal rights.

IV. The Fifteenth Amendment conferred nothing of its own force but the elective franchise. It was at first proposed to include therein the right to hold office; which is certainly more in the nature of a right than is service as a juror. But that proposition was voted down.

The condition annexed to the admission of Nebraska

into the Union is to the same effect as sect. 1 of
Amendment XIV. and Amendment XV.    It confers
the same rights, and no more.

*S. Robinson,* Attorney-General, for the People.

I.  That there shall be no denial of the elective fran-
chise, or of any other right to any person (excepting
Indians not taxed), by reason of race or color, is a part
of the fundamental, organic law of the land.    *Act of
Feb.* 21, 1867; *Session Laws of* 1867, 30, 31.

Granted, that the right to vote, the right to hold office,
the right to serve as a juror, are not in their nature
fundamental.

They belong to a man, not by virtue of his relation to
the rest of mankind as a fellow-man, but by virtue of
his relation to the government under which he lives as
a citizen thereof; and are, in their nature, wholly ficti-
tious.    And herein, I think, lies the true ground of the
distinction between such rights as are in their nature
fundamental and such as are not so.

But the act above cited is not limited by express
words to fundamental rights; nor am I able to see where
lies the presumption that the clause " or of any other
right " refers to fundamental rights only.    The elective
franchise, a right confessedly not fundamental, is not to
be denied, *nor any other right*.    There is no reason to
regard the term " right " as meaning fundamental right;
but since it is used along with the right of franchise, a
right not fundamental, the strong presumption is the
other way; and that no person shall be deprived of any
right, privilege, or franchise whatsoever, which is justly
his by virtue of the relation which he sustains to the
society or government of which he is a member or citi-
zen, by reason of race or color: for these rights are far

more numerous, including the right to sue, the right to serve as a soldier, &c., and scarcely less important, than those natural rights which we call fundamental.

II. I have not seen the case, cited by counsel for the plaintiff in error, which passes upon that section of the Federal Constitution which provides that " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States ; " but I clearly see that the rights there secured ought to be held to be such only as are fundamental.

For it would be *unequal, unjust,* and *unreasonable* to hold that one who is not a citizen of a State, and performs none of the duties devolving on a citizen, is entitled to vote, or to hold office, or to any of the rights which I have denominated fictitious, by virtue of any except the most express and unequivocal enactment ; though the language of that section might, without violence, when taken by itself, cover all rights whatsoever.

But it is *equal, just,* and *reasonable* that the section of our organic law which I have quoted, viewed in any and every light, should be construed to include all rights, whether fundamental or otherwise.

III. To serve as a juror is a right, as much as to hold office, though not always so desirable. That a penalty is imposed is merely accidental ; since it would be competent, if necessary, to impose a penalty for a failure to perform the functions of an office to which one might be chosen, as sometimes is done.

*Mr. Townsend,* for plaintiff in error, in reply.

I. The class of rights termed by the learned attorney-general " fictitious " always have been and are subject to amendment or repeal. To adopt the construction of the Act of Feb. 21, 1867, for which he contends, would

be to determine that the legislature has no power to abolish any mere statutory or conventional right existing at the time of the adoption of the above-mentioned organic provision. And again: it is apparent, from the fact that the elective franchise is the only right *specially* named in said organic provision, that it was necessary to name it *specially*, as the general class of rights therein secured did not include it, nor any other right not fundamental.

II. So far as the Act of Feb. 21, 1867, is in conflict with the Fourteenth Amendment to the United-States Constitution, the latter repeals the former. The Amendment is the later law. If the former prohibited Nebraska from regulating the elective franchise and other conventional rights, the latter permitted her to resume such power of regulation. See sect. 2, Amendment XIV. And if the former allowed discrimination in the matter of rights and privileges, as between males and females, the latter clearly does not. See sect. 1, Amendment XIV. Nor can the legislature be permitted to deny any thing to a female simply by designating the thing denied a " right," instead of a " privilege " or " immunity ; " for, if there be any variance in the definition of these several terms, that of the word " right " is the more strict and narrowed. A right may be *demanded* as something which the State is bound to concede to the individual; while " privilege " or " immunity " presupposes a grant from motives of favor or policy. ·

III. The term " electors " in the jury law of Nebraska means now what it meant when enacted, — electors for all purposes, National as well as State.

CROUNSE, J.

On the trial of this cause in the Court below, Howard

BRITTLE *v.* THE PEOPLE.

Crossley, a colored man, was allowed to sit as one of the jury that returned a verdict of guilty against the plaintiff in error. Exception was taken to the holding of the Court permitting him to sit. This exception presents the principal question for our decision.

Prior to the admission of Nebraska as a State into the Union, none but *white* males were allowed by the laws of the Territory to sit upon juries. As part of the Act of Congress, passed Feb. 9, 1867, admitting the State, it is declared, " That this act shall not take effect, except upon the fundamental condition, that, within the State of Nebraska, there shall be no denial of the elective franchise, or of any other right, to any person, by reason of race or color, excepting Indians not taxed."

Two questions have arisen under this act, — the first presented by counsel for the plaintiff in error, who insists that the words " any other right " do not include service on a jury : the second is raised by a member of the Court in the counsel-room for the first time, who contends, as I understand it, that this clause, denominated the " fundamental condition," recited above, is not a part of the organic law of the State.

As a rule, objections not raised upon the trial of causes in the Court below should receive no attention here ; but, inasmuch as the one suggested is of great importance, it is well to state briefly the position of the majority, and fix, as far as a decision of this Court can, the right of the colored man in this State.

Nebraska, as a part of that vast tract of country ceded to the United States by France under the treaty concluded at Paris April 30, 1803, was organized as a Territory by Congress, in the year 1854, by what is familiarly known as the Kansas-Nebraska Act. The appointment of a governor, secretary of state, judges, and marshal, and the election from time to time of a legislature,

BRITTLE *v.* THE PEOPLE.

were provided for in this organic act, and a territorial government established and conducted under it.

In April, 1864, Congress passed an enabling act, providing for the election, in June of that year, of delegates, who should meet in convention in July following, for the purpose of framing a constitution, with a view to the admission of Nebraska as a State into the Union. The sentiment of the people at that time being opposed, evidently, to becoming a State, the delegates chosen in the manner provided, upon meeting, refused to make a constitution, and adjourned *sine die.*

Without any further act of Congress, the territorial legislature of 1866 submitted a proposed constitution to the electors, to be voted on in June of that year, with directions to choose, at the same time, legislative, executive, and judicial officers for the proposed State. The governor, secretary of state, and auditor of the Territory, were, by the act submitting the instrument, constituted a board of canvassers; and they declared the constitution adopted by a majority of a hundred.

The legislature thus chosen assembled in July, the time prescribed, and chose two senators to represent the State, who, together with the representative in Congress, took the proposed constitution to Washington, and prayed Nebraska's admission. This constitution, in prescribing the qualifications of electors, limited the right to vote to white males. To this restriction Congress took exception, and, after much debate, on Feb. 9, 1867, passed an act as follows : —

" An Act for the Admission of the State of Nebraska into the Union.

" Whereas, on the twenty-first day of March, A.D. 1864, Congress passed an act to enable the people of Nebraska to form a constitution and State government, and offered to admit said State, when so formed, into

BRITTLE *v.* THE PEOPLE.

the Union, upon compliance with certain conditions therein specified; and whereas it appears that the said people have adopted a constitution, which, upon due examination, is found to conform to the provisions and comply with the conditions of said act, and to be republican in its form of government, and that they now ask for admission into the Union: therefore

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the constitution and State government which the people of Nebraska have formed for themselves be, and the same is hereby, accepted, ratified, and confirmed; and that the said State of Nebraska shall be, and the same is hereby, declared to be one of the United States of America, and is hereby admitted into the Union upon an equal footing with the original States in all respects whatsoever.

"Sect. 2. — *And be it further enacted*, That the said State of Nebraska shall be, and is declared to be, entitled to all the rights, privileges, grants, and immunities, and to be subject to all the conditions and restrictions, of an act entitled 'An Act to enable the People of Nebraska to form a Constitution and State Government, and for the Admission of such State into the Union on an Equal Footing with the Original States,' approved April 19, 1864.

"Sect. 3. — *And be it further enacted*, That this act shall not take effect except upon the fundamental condition, that, within the State of Nebraska, there shall be no denial of the elective franchise, or of any other right, to any person, by reason of race or color, excepting Indians not taxed; and upon the further fundamental condition, that the legislature of said State, by a solemn public act, shall declare the assent of said State to the said fundamental condition, and shall transmit to the President of

the United States an authentic copy of said act; upon
receipt whereof, the President, by proclamation, shall
forthwith announce the fact: whereupon said fundamen-
tal condition shall be held as a part of the organic law
of the State; and thereupon, and without any further
proceeding on the part of the State, its admission into
the Union shall be considered as complete. Said State
legislature shall be convened by the Territorial gov-
ernor within thirty days after the passage of this act, to
act upon the condition submitted herein."

The State legislature was convened by the governor
accordingly; and on the twentieth day of February,
1867, after reciting the act of Congress, and their con-
vention under it, declared : —

"*Be it enacted by the legislature of the State of Ne-
braska,* That the act of Congress of the United States,
entitled 'An Act for the Admission of the State of
Nebraska into the Union,' passed Feb. 9, 1867, be, and
the same is hereby, ratified and accepted; and it is
hereby declared that the provisions of the third section
of the said act of Congress shall be a part of the organic
law of the State of Nebraska."

This action was certified to the President, who, on
the second day of March, 1867, made proclamation as
required.

Thereupon our senators and representatives were
admitted to seats in Congress; the Territorial officers
retired; those elected for the State nearly a year before
entered upon the discharge of the duties appertaining
to their respective offices; and a State government
went into operation. State officers have repeatedly been
elected, and senators and representatives have been
chosen to represent us in Congress. Many and impor-
tant laws, made necessary because of the transition
from Territorial to State government, have been enacted

by the legislature. The lands, to the value of millions of dollars, given by this act, as well as under general laws of Congress, to new States on their admission, have been accepted and appropriated. Colored men, without objection, as far as my knowledge extends, have voted at each election; and one of the first acts of the State, through its legislature, was to inscribe upon its great seal the motto, " Equality before the law : " and, in fine, every thing has been done in recognition of a State government, and of the extent of the organic law as it passed from the hands of Congress, until this case arose. As our very right to sit here as a Supreme Court depends on the existence of a State organization, based on a constitution creating our existence and defining our powers, the fact that such government and such constitution exists must at once be conceded by us.

But, as I understand the objection, it is contended that the constitution by which we are bound is the one submitted to Congress when admission was asked, and does not include the fundamental condition forming part of the act of admission ; that Congress was not competent to impose such condition, and that the legislature of the State, having no inherent power so to do, and not being elected with reference to such action, or instructed to that end, could not accept the condition so as to bind the people of the State ; that, to be binding on the State, it must have been submitted to a vote the same as was the constitution proper. In short, the argument amounts to this, — that the constitution, saving the fundamental condition, is a valid and legal instrument, because it was submitted to, and voted upon by, the people ; while the fundamental condition is not valid or binding, because it was not so submitted.

Were we able to refer to any known law, or to any uniform precedent, governing the introduction of new

States into the Union, and were this a tribunal to which appeal might be made to enforce an observance of that law or custom, our duty in the premises would be comparatively simple. But the matter of admitting States is purely a political question, committed to another forum altogether, whose action, as will be seen by a reference to the history of the formation of State governments, has been as various, almost, as the occasions in which States have been admitted. When, however, a State government has been formed, and the State admitted into the Union with a given constitution, courts must recognize, and are as fully bound by, the fact as the merest citizen; and I submit, with all respect, that we can as well dispute the validity of the United-States Constitution, because the convention framing it, disregarding all instructions limiting its members to making amendments to the old articles of confederation, assumed to make an entirely new frame of government, as we can inquire into any supposed irregularities or illegalities which may have entered into the construction of our own. Lest there should be any doubt upon this position, we have only to pause and see to what alarming or absurd conclusions the contrary doctrine would lead us.

As we shall see more fully hereafter, the people of the Territory cannot frame a State government, and force themselves into the Union. Congress, under the Constitution, is charged with the duty of making all needful rules and regulations respecting the territory of the United States. It has given to Nebraska a Territorial form of government. A State and Territorial government could not possibly exist at one and the same time. This is seen by the fact, that, until our admission, the Territorial government continued in full force, notwithstanding the vote of June, 1866. What we chose to style a State constitution was at most a proposed instru-

ment, and of no more force until admission than blank parchment. Those who had been chosen as State officers had no offices to fill, and were mere private citizens, governed by the laws and officers of the Territory. It was Congress alone that could admit the State. But Congress refused to admit us with a constitution including the word "white," and proposed to accept us with a constitution in all respects like the one we sent up, except that the word "white," by a fundamental condition attached, was stricken out.

Now, if we inquire into the manner in which this fundamental condition was imposed, and say that it would be binding if it had the vote of the people, and not binding if it lacks it, we can make the same inquiry with reference to the remainder of the instrument.

As is well known, the constitution was originally drafted in a lawyer's office by a few self-appointed individuals. These importuned the legislature then sitting to submit it to a vote of the people. At the start, then, we must reject the instrument, or admit that any one may draft the organic law of a proposed State who chooses to volunteer.

The legislature of the Territory owes its existence to the organic act of Congress, passed in 1854, which empowers it to legislate on all " rightful subjects of legislation." To undertake to subvert the very government under which it assembles and acts is not a " rightful subject of legislation: " on the contrary, it is revolutionary. These " rightful subjects " must be such as are usual, and as are for the benefit of the governed, and must be acted upon in recognition of the existence of the Territorial government. The legislature of the Territory have not inherent or original power to make or submit constitutions. Whatever they may do in that direction is without authority, and is done only by indul-

BRITTLE *v.* THE PEOPLE.

gence of Congress. Authority is scarcely needed on this point; but I extract from a long opinion of the Attorney-General of the United States the following : —

"The Territorial legislature cannot, without permission from Congress, pass laws authorizing the formation of constitutions and State governments. All measures commenced and prosecuted with a design to subvert the Territorial government, without the consent of Congress, are unlawful." Vol. ii., *Opinions of Attorneys - General*, p. 726. *Vide* also *Webster's Works*, vol. vi. p. 485 ; *Jam. Con. Convention*, 200.

This is conceded to be so by Reverdy Johnson, one of the ablest opponents to Nebraska's admission in the United-States Senate. *Cong. Globe*, i., 2d session 39th Cong., p. 356.

So, in point of legality, there was no more authority in the Territorial legislature to direct the people to vote upon the constitution than might be possessed by a religious conference, a teachers' institute, or a woman's-rights convention. If, then, we are satisfied with the legality of the proceedings thus far, and are prepared to say that a constitution can regularly be drafted by any one, and submitted under the decision of any body, we have reached another very important inquiry : To whom shall the instrument be submitted, so as not to impair its validity ? Where shall we look for any direction in the matter ? The organic act is silent. We have not the aid even of an enabling act: if we had, and it should undertake to prescribe to whom the instrument should be submitted, I fear our objectors would take offence at the unwarrantable interference of Congress in presuming to direct on so important a matter. We must bear in mind that we are establishing a government for the people, male and female, black and white, young and old. All are to be governed alike by the organic law to be

made; and all should, in theory, be consulted in the establishment of such a law. We might not experience much difficulty in excluding all below twenty-one years of age. Should an attempt be made to exclude females, we should be opposed by all the woman's-rights advocates, who would insist upon equal right and ability to vote upon the question, and who would point to republican forms of government where women are allowed equal rights with men. So any offer to limit the vote to the white male would be opposed by the claim, that the black man was equally invited on the public domain, and had helped to build up the Territory, and that he was as much concerned in the form of government about to be established as the whitest. We look in vain over the whole field of law to find any legal definition of a voter; but, because this legislature has assumed to submit the instrument to the vote of white males of a certain age who have established a prescribed residence, we must declare judicially that this submission is legal. Let us follow one step farther.

Where the existence of an office, or the right of an officer to fill it, depends on an election, such office or officer must have a majority vote. If we are in a position to say that a constitution, to be binding, must have the vote of the people who are to be governed by it, it would be idle to say that the requirement is answered by a mere formal vote, irrespective of which way a majority may have voted. When the question is submitted to us, if we can inquire at all in the matter, we must see that the State government had the support of a clear majority of those voting upon it. If this were not so, the fate of the people would rest with precinct, county, and territorial board of canvassers, who, acting under no law for violations of which they could be punished, as here, might, however great the majority opposed might

be, still declare the constitution adopted. Suppose, then, a member of this Court is sitting as judge in his district. A criminal is put upon his trial; and, as a defence, he offers to show, that, at the June election in 1866, a clear majority voted against the adoption of the constitution, notwithstanding the board of canvassers have declared otherwise: therefore there is no State government, and no right in the judge, whose powers rest upon the constitution, to try him. I am satisfied that he could make a fair showing in that direction. It is said that a whole precinct in one county was thrown out, where the majority was largely against the constitution; that, in another place, a large number of soldiers voted in its favor, with no pretext of right so to do; and, in other respects, irregularities intervened which might easily overcome the declared majority of a hundred. This might well be where a vote was had under no competent authority, and where no one, for ballot-box stuffing or for false returns, could be punished. Would the Court allow the evidence? If so, and the jury should find that the constitution was in fact defeated, what follows? The criminal must be discharged, the judge vacate the bench, other officers subside, and the State fall into a condition of anarchy, — both State and Territorial governments being gone.

This, then, is the legitimate conclusion, fairly stated as I believe, that must or may follow from any attempt on our part to treat as judicial those questions which are solely political. We are not only liable to destroy an entire State government, but, at the same time, present the singular spectacle of a court sitting as a court to declare that we are not a court.

However, the Court are all agreed that the constitution proper is valid. Yet we have seen that it was born in a law-office, instead of a convention; that it was

BRITTLE *v.* THE PEOPLE.

made by no one under any authority whatever; and that it might as well have been made by any one else as by those who did draft it.

Again: we have noted that it was submitted by nobody lawfully empowered to do so; that no one was obliged to vote, and no one could be punished for voting a thousand ballots at the pretended election. And we have further seen, that, whether carried by a majority vote in fact or not, we are nevertheless a State working under the constitution so voted for. Why is this? The answer is not a difficult one when the question is viewed in its proper light.

It may be innocent vanity to arrogate to ourselves great importance as "the people," and talk of the unwarranted interference by Congress in attempting to thrust upon this "people" institutions and laws against their wishes: but we should not forget that the very territory we are on was purchased and owned by the people of the United States; that they have directed 'Congress, under the Constitution, to make all needful rules and regulations respecting the territory; that, as long as we were on this territory, we were subject to, and had to abide by, such laws as they chose to make; and that not until we were strong enough to defeat the United States by arms could we hope for any change from such Territorial rule without the permission of Congress. How is such change to be effected? Some one or some body, assuming to act for the people, may make a constitution, and may elect officers for the proposed State. Congress may refuse to recognize such State government. It therefore amounts to nought. The people may assemble as often as they see proper, and may make, from time to time, a score of proposed constitutions, and elect as many sets of officers. Each is as good as the other; and all are good for nothing un-

BRITTLE *v.* THE PEOPLE.

less indorsed by Congress. It is an act of Congress that gives vitality to the action of the people. By article iv., sect. 3, of the United-States Constitution, it is declared, "New States may be admitted by the Congress into this Union." No other authority exists anywhere for the admission of new States. This is all that is said. The manner in which such States shall be formed, or how they shall be introduced, is nowhere prescribed. It is a political question, to be settled by the people of the Territory on the one side, and Congress on the other. When the fact of admission is established, the Court are bound by it, and cannot go behind it. To say that the people of a Territory must frame — that is, write out — their constitution in the first instance themselves, is not correct. The document might be imported from Japan, or fall from the clouds; and if, by any subsequent action, it becomes the constitution of the State, we are bound by it, and cannot question where it came from. It is equally erroneous to say, as a conclusion of law, that, to be valid, it must be submitted to a vote of the people. Who will point us to any law requiring it? To which of the people shall the Court say it must be submitted? To the electors over twenty-one years of age? But to which? — white or black, literate or illiterate, poor or rich, male or female?

Suppose a constitution were draughted, and to it were appended the subscription of nine-tenths of the names of all the males — white, if you please — residing in the Territory, praying admission as a State into the Union under the constitution submitted, and Congress should admit the State accordingly. Will objectors contend that the constitution is invalid because not having been submitted to a vote? Will any be ready enough to contend that a vote without authority, where any one may vote as often as he pleases, or may refuse to vote

BRITTLE v. THE PEOPLE.

at all, is a better expression of the wishes of the people than the subscription I have instanced?

Again: suppose the electors should, upon the call of any influential man, assemble pretty generally in mass meeting, by almost unanimous agreement adopt a constitution for a proposed State, and Congress should admit the State accordingly. Will the Court again insist that the instrument is invalid because wanting the formal vote of the people?

If these questions are answered in the negative, — as they must certainly be, — we then have established a very important point in this discussion; viz., that while, by a vote of the people themselves, a constitution may not become operative, it may become so without a formal vote. This vote, then, which is insisted upon as a legal requirement for a valid instrument, is nothing more nor less than a means of signifying the wishes of the people to become a State, and of their acceptance of a given constitution. Congress, deferring to the wishes of the people who are to be organized into a State government with a given constitution, as a political rule of action, generally acts upon the assumption, that it is the wish of the people to have such a government, and that they are satisfied with the proposed constitution. Any thing which expresses that wish and satisfaction will answer, whether it be by vote, caucus, petition, or by simple acquiescence in receiving a constitution, and organizing a State government under it. That Congress may mistake the sentiment of the people at times, innocently, is not surprising; neither does it make any difference if the State government is nevertheless established. In our case, not near a full vote of the electors was had. How those staying at home would have voted is not known. Of those who did vote, it is very uncertain whether a clear majority voted for the adoption of the constitution.

Whether they did or not in fact was a question for Congress alone ; and its decision is final.

The same is true were Congress to act wilfully wrong, and to assume to recognize one political faction of the Territory as the representatives of the people as against the other. Take the case of the troubles in Kansas between the advocates for a free State and those advocating a slave State. Had Congress chosen to admit the State with either a free or slave constitution, in violation of the wishes of a clear majority of the people, however much its action might be condemned as unwise political conduct, if a State government had been organized under either, as long as such government existed, and the constitution remained unchanged, such organic law would have been binding on the people. Their remedy must be in changing the organic act, or refusing to continue or conduct a State government under it. While it exists, the courts, in common with the people, are subject to its control. In my opinion, we may safely go still farther. I think it has been clearly shown, that whatever the people of a Territory may do by way of a vote, petition, or otherwise, with a view to admission into the Union, is designed to signify to Congress our desire to become a State, and our satisfaction with a certain proposed constitution. Now, suppose Congress, acting upon a supposed wish on our part to become a State, should draught a constitution, and append to it an act declaring that the people might form a State government under it, and, when the fact of the election and installation of officers was certified to the President, he should declare it to be, and the State thereupon should be, one of the Union. We might reject the offer, and refuse to organize. But, should we organize and conduct a State government, can it be maintained that we would not be a properly-organized State ? and would it become a court,

whose existence rested solely upon the constitution so adopted, to declare the constitution, or any part of it, illegal?

We have now established several propositions, in the light of which we can understandingly look at the action of Congress and of our own people in establishing the fundamental condition under consideration. In 1864, Congress proposed that we might then frame a constitution, giving political right to white males alone, if we desired, and we could be admitted. We refused to do so. In 1867, when we desired admission with such a constitution, we were told, in effect, that the proposition of 1864 was not a standing offer; that, in the march of events, the black man had risen in the consideration of the nation represented by Congress; and that in all the dominion under the jurisdiction of Congress, including Nebraska Territory, the right of franchise had been granted to black and white alike, and that no steps would be taken backward. We were rejected with our proposed constitution. Congress, in turn, by the fundamental condition attached, amended our proposed constitution by erasing the word "white," and returned it to the State legislature to approve for the people of the Territory. And here, I may remark in passing, is the first of all the proceedings had up to this time which had the semblance of regularity. What had gone before, we have seen, was transacted by any one who chose to act, and was done in the most irregular manner. Up to this time, Congress, which could legally give any direction in the matter, had taken no notice of our proceedings, and given no warrant for our action. But it is said the State legislature had no authority to accept the amended constitution. Grant it. Congress, however, assumed to recognize it as the representative of the people, and the legislature assumed to act for them.

Agents not unfrequently transcend the limits of their authority. Congress might well say, that, by a recent act, equal rights in Nebraska had already been given to the colored man, and that it could make no difference with our people whether the same rights were continued under a State or a Territorial government. The legislature would be quite likely to look at the matter in the same way, and count upon its action receiving the indorsement of the people. In this they were not mistaken. Instead of refusing to be bound by the action of the legislature, the people ratified it most heartily. Representatives and senators at once took their seats in Congress. All the State officers qualified and engaged immediately in the discharge of their several duties. Legislature after legislature have been returned by the people; and I have yet to learn of the first instance of refusal to recognize the government. It is a familiar maxim in the law, "that a subsequent ratification is equivalent to a previous command." It may be said, that the fact that senators took their seats in Congress, that the State officers entered their offices, and that the legislature met, is not a ratification by the people, but by those several officers. This may be so; but it is very strong evidence to conclude the people. It is charging extreme recklessness upon them, and a terrible greed for office, to say that they all, with one accord, would accept office, and thereby organize a State government against the sentiment of the majority of the people. That this is not true, however, is known by the fact, that, at the very first election, the people themselves engaged with unanimity in the election of State officers; and, to show that they recognized the binding force of the organic law, blacks were permitted to vote the same as whites.

But it may be further contended (and I must anticipate or surmise the several objections which may be

BRITTLE *v.* THE PEOPLE.

entertained by my dissenting brother, because none of these objections were suggested on the argument, and I am not advised of the grounds upon which the minority rejects the fundamental condition), that although the legislature ratified the fundamental condition, and we have accepted a State government under the act of admission, inasmuch as we asked admission in the first instance with the original constitution, and we have been declared admitted, now that we are in we can repudiate the action of Congress and the legislature, and fall back on the constitution that Congress rejected. That is pretty good. I send my servant to my neighbor to buy his ox, saying I will give but fifty dollars. My neighbor says flatly that he will not sell for fifty, but will let the ox go for sixty dollars. My servant agrees, and drives the ox home, telling me what he has done. I eat up the ox; and, when my neighbor comes for his sixty dollars, I put him off with fifty, on the ground that my agent exceeded his authority. Or to state a case more nearly in point: A half-dozen gentlemen apply to the legislature, asking to be incorporated under a proposed charter which they submit, in which, among other things, it is proposed to carry all white persons at a sum named per head. The legislature makes the grant in all respects the same as asked, except that they append the condition that black persons are to be carried alike with white ones. Can they accept the charter, and then kick the first black person off their cars who comes aboard and offers to pay the same as the others? Clearly not. The same is the case here, unless there is one law, one rule of honesty and fair dealing, when it relates to transactions between individuals, or between a State and its citizens, and another rule when the transaction is between a State and the United States. This bench was among the

first to qualify and enter upon their duties. When we took the oath, and accepted the office, of judges, we swore we would support the constitution of the State. We know that Congress refused to admit us with the original constitution, and that Congress had said, in the act of admission, that our constitution could be operative only upon " the fundamental condition," that, within Nebraska, there should be no denial of the elective franchise, or of any other right, to any person. Did we inject into the oath the mental reservation, that, while Congress meant and insisted on one thing, we would interpret it another way? Answering for this fraction of the Court, I must say I did not. I cannot regard the organization of State governments, and their introduction into the Union, as the result of cheat or fraud. If the rights of the black man are to be assailed, let it be done boldly, and not by what seems to me a breach of faith. If the terms proposed by Congress were not acceptable, we had the high privilege of remaining a Territory, and staying out of the Union. But when, on its part, Congress raised us to the dignity of Statehood; gave us representation in Congress, and a voice in the affairs of the nation; donated to us munificent grants of land and money, — all for the small consideration that we would do justice to a few theretofore proscribed people, — it behooves us to keep faith, and abide by the terms of admission.

I pass to notice the objection raised by counsel, — that the fundamental condition does not include the right to sit upon juries. It is true that the right to sit upon juries is not a natural right; neither do I believe that the words " any other right " were used with the purpose of extending only to these. Introduced in connection with the grant of the elective franchise, an artificial right, it is evident to my mind that these other

Brittle *v.* The People.

rights referred to mean rights of the same class, — rights attaching to a citizen because of his relation to the government. That this interpretation is in accord with the sentiment of the ruling majority of the body from whom the act proceeded, we need only to glance at the debates of, and to the character of legislation enacted by, Congress about the time the act before it was passed. Emancipation had been accomplished. Black men were enlisted into the United-States armies; and they had proved their loyalty to the government in suppression of the rebellion. In the re-organization of government in the rebellious States, they were allowed equal rights with the whites; and the doctrine that intelligence, or fitness to participate in the affairs of government, was influenced by the circumstance of color, had become exploded. It is in the light of this history we are to interpret this act of Congress, rather than with the technical refinement put forth by the ingenuity of counsel.

That jury service is a duty, I admit. That it is a right also, I maintain. To be of the " good and lawful men " from whom juries are to be formed is an honor and distinction as well as the subject of duty. To say to the black man possessing equal intelligence and fitness with his white neighbor, that he cannot be allowed on a jury because of the misfortune of his color, is an insult from which he has a right to be saved. To permit a jury of white men to sit in determination of his right to property when assailed by a white man, or his right to life or liberty, when he is regarded as but little better than a brute under the law, is rank injustice. When the white man acts under the consciousness that the black man may some day sit in judgment upon his rights, and that he in return may measure with the same measure that is applied to him, an important right is accorded him.

### Brittle *v.* The People.

The right to sit on the jury is not a natural right that can be demanded at the hands of the Court. What I contend for is, that there is no right to discriminate because of color. A white man may be called as a juror; and because of interest, prejudice, deafness, a want of understanding, he may be rejected; and he could not claim the right to insist upon sitting. So a German citizen may be called with no knowledge of the English language, when the trial is conducted in English. He may be rejected; and no protest of right on his part to sit would avail him or any party who should claim his right to sit. In such case, however, he is excluded, not because he is a German, but because of his lack of knowledge of the English language.

Disguise it as we will, when we say that black men shall not sit upon juries, it is because they are black, and is an insult to the race. This is a clear violation of a political right which Congress secured to the colored man when we were admitted. Until you put him on an equality in the race for honor, distinction, and preferment, we have infringed his rights. If intelligence is wanted on the jury, exclude the unintelligent alike of all classes, race, or color.

We cannot cloak such injustice under the guise of saving the black from the burden of jury service. If it can be done in the case of black citizens, we can as well do it in the case of the Irishman, the German, or the citizens of any other nationality. Our perceptions of the great principles of right may not be so clear when applied to a few of that class of citizens, who, since the birth of the nation, have been the subjects of oppression and insult. But let us amend our jury law so as to confine the service to native-born citizens. The result would be that such a war of races would be inaugurated as would soon awaken us to the injustice being

BRITTLE *v.* THE PEOPLE.

done to a great body of our fellow-men. To protest that such proscription was but an act of kindness, prompted by a disposition to save our foreign brethren from the burden of jury service, I fear would not be satisfactory.

Without pursuing the discussion further, I conclude, then, that not only does the fundamental condition attached to the act of admission form a part of our organic law, but that the condition extends to the right to sit upon juries.

. The judgment of the Court below must be affirmed.

JUSTICE LAKE concurs in the foregoing opinion.

MASON, Ch. J., dissenting.

On the trial below, one Crossley was called into the box as a juror; and the defendant challenged him on the ground that he was " a colored man, and not a free white male;" which fact was made duly to appear. The challenge was not sustained; and he was sworn as a juror. Upon this very simple state of facts two questions arise, — whether, under the laws of this State and the amendment of the Constitution of the United States, Crossley was a competent juror; and whether, under the laws of this State and the third section of the act of Congress admitting Nebraska into the Union, he was a competent juror. In the opinion of the majority, it is insinuated that I raised the latter question for the first time in the counsel-room; that it receives attention at their hands, contrary to the correct practice, but out of deference to the importance of the question.

But any person conversant with criminal procedure can readily see that the very question was involved in the objection taken on the trial by the defendant; and it was discussed by the learned attorney-general in his

BRITTLE *v.* THE PEOPLE.

argument, although the counsel for the defendant placed his case on the other question. I understood him to do so, because, in his view, one point really involved the other. So that the point was not first raised by me.

But it is a very familiar principle of criminal law, that it is the imperative duty of a judge to see that a defendant, on trial for felony, loses no right by reason of his own silence, or his counsel's ignorance or neglect. Had any point fatal to the judgment not been made on the trial, or on the argument here, and any one of us had observed it, how could we justify ourselves to our own consciences if we failed to bring it forward, and decide upon it? Certainly not by saying that it would be unpopular or unjust to some third party.

I have noted this point in the opinion of the majority, because all through it seems to run an anxious spirit to turn this judicial judgment into a partisan discussion; and I cannot turn aside to give it any words hereafter.

The history of the admission of Nebraska into the Union, given at length by my brother Crounse, may be briefly stated thus: A small number of men, without authority of law, drew up the constitution; and the legislature provided for its submission to a vote of the people. This instrument provided, that "every male person of the age of twenty-one years and upwards," . . . who is a "white citizen of the United States," should be an elector. At an election held for the purpose, a majority voted for the constitution. This majority was small; and my brother seems anxious to concede that there was no majority at all, but that it was only made to appear by divers transparent frauds. Nevertheless, the canvassers appointed by the legislature for the purpose, consisting of the Territorial governor, secretary, and auditor, declared the vote

BRITTLE v. THE PEOPLE.

favorable to the constitution. But Congress passed a law for our admission, which should not take effect except upon " the fundamental condition, that, within the State of Nebraska, there shall be no denial of the elective franchise, or of any other right, to any person, by reason of race or color, except Indians not taxed; and upon the further fundamental condition, that the legislature of said State, by a solemn public act, shall declare the assent of said State to the said fundamental condition." The body of men elected as a legislature of the proposed State, at the same time that the popular vote was taken, was convened, and passed an act declaring that the above clauses should be part of the organic law of the State. Thereupon the State was admitted into the Union.

There is much discussion as to each of these circumstances. The proceedings were throughout very irregular. But no just argument can be drawn from that fact. There are but two circumstances in the whole course of this history which deserve a moment's attention, — one, the vote of the people upon the constitution, without which all that had gone before was of no avail; the other, the action of Congress. Each, in its turn, cured all irregularities which preceded it, and relieves us of the necessity of any inquiry in respect of every thing else.

So, too, the introduction into the discussion of the question, who ought to vote upon a constitution, is a mere diversion. While, abstractly, everybody, without regard to age, sex, color, race, intelligence, or other quality, might claim a right to vote upon the fundamental law to which he is to be subjected, practically some limit must be and always has been imposed; and that limit has been the qualification of electors under the previous government.

BRITTLE *v.* THE PEOPLE.

One point further in this connection. But for the act of Congress, the "solemn public act" of the so-called State legislature would have been of no force. The reason is obvious: it conflicted with a provision of the State constitution, every clause of which was as binding on the first legislature as on any subsequent one.

The matter is thus reduced to a single point. All that "self-appointed men" and the Territorial legislature did, and all discussion of who are the people and who ought to vote on the constitution, and also all cavil as to the mode of conducting the election and canvassing the votes, and the act of the legislature pretending to amend the constitution, being laid out of view, the simple question is, Could Congress change the constitution which the people had adopted, and admit the State into the Union with its fundamental law so changed, without the consent of the people? The change made by Congress was *only one word*. It was a change right to be made. But that is not the question. If Congress can change one word, it can change the whole instrument; and we are confronted with the grave, the novel question, whether Congress can make a constitution for a community, and force them into the Union under it, without their consent. Whether the principles of the proposed government are right or wrong, is not the question, but whether the people of the new State or Congress is the body to determine those principles.

I am disappointed to find that this question, the fundamental one in the case, has received almost no attention from the majority of the Court. Their sight has been so distracted by the many circumstances which are detailed in the opinion with a mild humor, that they have been almost blind to the real issue. When Judge Crounse comes the nearest to the consideration

BRITTLE *v.* THE PEOPLE.

of the true point, he says, that, although the State legislature could not amend the constitution, yet Congress assumed to recognize it as the representative of the people. But the trouble here is, that, being elected by the people to legislate under the restrictions of the constitution, the legislature was not, nor could Congress by recognition or otherwise constitute it, the representative of the people, to overturn the law which the people had established for it as well as for the citizen. (And then it is said that the people are concluded by electing officers under it.) To apply the doctrine of estoppel to the people, acting in their primary and sovereign capacity, is the merest pedantry.

And then the morality of getting into the Union under the pretence of amending our constitution, and deceiving Congress, and afterwards repudiating the amendment, is urged and illustrated by what is presented, I suppose, as a parallel case of an ox trade. I must confess that this style of arguing the very gravest constitutional question ever presented to a judge, so far from carrying conviction to my mind, seems to me most frivolous and absurd. But let us see whether we are guilty of any bad faith in repudiating this so-called " solemn public act." Was the Congress of the United States deceived at all by what we did? Did not the very best constitutional lawyers of the land, who were members of that body, know very well what was the full force and effect of that act? The question carries its own answer. But, furthermore, did this State perpetrate a fraud in getting into the Union by means of that act? The people of this State never voluntarily entered the Union with a constitution amended by the erasure of the word " white." Congress admitted representatives from the State, and the Territorial government was withdrawn; and nothing remained for the

people but to go on under the State government. Coerced in this way, their action now is said to conclude them ; and an attempt to reclaim their independence is called dishonest, fraudulent, and bad every way. No words of mine can make more clear the transparent fallacy of this position.

And this is all that this learned Court has to say upon this question. But we cannot leave it here. It is too serious to be answered by a sneer. It is too profound to be solved by an appeal to partisanship.

The Declaration of Independence declared, that " governments derive their just powers from the consent of the governed ; " and this fundamental and just maxim is the governing and dominating rule of American polity. The idea has been expressed in different terms by different statesmen and bodies, — as that " this is a government of the people by the people for the people," or that " constitutions and laws can be rightfully formed and established only by the people over whom they are put in force." Our constitutions all commence, " We the people ; " and, throughout their structure, the people as the source of authority, the power to which every officer must give account, is the one dominant sovereign. It is too late in the day to question or to vindicate this maxim of the American civil polity.

Another principle equally fundamental, equally well settled, and universally received, is this, — that the Federal Government is, in the sphere of its constitutional authority, sovereign, but, out of that sphere, is subordinate. The mutual relations of the States and the United States are so perspicuously and forcibly stated by Chief Justice Taney in *Ableman* v. *Booth*, 21 *Howard*, 506, that I shall content myself by simply referring to what is there said. It has always been conceded that Congress could not prescribe a form of government to a

BRITTLE *v.* THE PEOPLE.

people, save that it should be republican in form. To go beyond this is without its jurisdiction.

Now, apply these two familiar principles of American government to the case in hand; and we shall be conducted directly to the position that Congress cannot frame a constitution for a community, and, without their consent, force the same upon it. The people of the proposed State are to be " the governed." The government which is set over them should have their consent and approval, or it does not possess just authority; and the fundamental maxim is violated.

Again : it is not within the constitutional power of Congress to frame a constitution for a people, and, *nolens volens*, force it on them. The Federal Constitution authorizes it to guarantee a government republican in form to every State. The expression of this one power over the State excludes the exercise of all other powers. It was competent to open the constitution with which Nebraska presented herself asking admission, and see whether it provided a government republican in form. If that constitution did not provide such a government, Congress could refuse admission, or enter into negotiations with the people of the proposed State to secure the necessary amendment. But it could not say to the applicant, " This instrument requires your judges of the Supreme Court to hold the District Courts : I will change that, and then force you into the Union with the constitution so modified." That would have been beyond the competency of Congress, because it would have been exacting more than the constitution authorized it to exact. Besides, the provision that " new States may be admitted by the Congress into this Union " clearly indicates, by the frame of the clause, the authority to admit them upon their application, and not to force them in upon arbitrary terms prescribed by Congress.

BRITTLE *v*. THE PEOPLE.

These views are confirmed by the uniform practice of Congress in admitting new States. The requirement has always been of the distinct approval by the people, in their primary or representative capacity, of their fundamental law. Whenever a State has applied for admission, with a constitution containing some provision which Congress did not approve, it has been returned with some proposed change to be submitted to the people. Until the case of our State arose, no single instance ever occurred of Congress admitting a State without the popular approval of the constitution. This practice, obtaining in the days of the framers of the Federal Constitution, and continued in without exception, is an authoritative construction of it; at least, it is a strong confirmation of our view.

And a consideration of the consequences of the opposite view affords further confirmation. Concede to Congress the power to frame a constitution for a people, force them into the Union under it without their approval, and see how it would work in a particular case. There is the Territory of Colorado. Let Congress provide a constitution for it. One provision may be, that it shall not be changed without the approval of Congress. Then, according to the rule in *Luther* v. *Borden*, 7 *Howard*, 1, an attempt to amend it in any other way is treason, and may be punished with death. Then suppose it is provided in this congressional constitution that no person shall be eligible to a seat in the legislature who is not a postmaster, nor to an executive office who is not an Indian agent; so that the entire State government may be dictated from Washington. There you have all the powers of the States absorbed by the government at Washington, and the whole theory of the relations of the local and central authorities subverted. That is an extreme case. But, if Congress can dictate

BRITTLE v. THE PEOPLE.

to a people one word of their State constitution, it may dictate the whole. Concede the power in one point, and you concede it in all. And a principle which is logically capable of such consequences is utterly unsound and dangerous.

I am aware that it will be said that Congress would never do such a tyrannical thing as our supposition implies. In these days of centralization, it is hard to tell what Congress may not do. When we reflect that at the time of the discussions over the Lecompton Constitution in Kansas, by which the whole country was convulsed, it was universally supposed that the doctrine was once and forever settled, that no Territory could be forced into the Union until its people had had a full, fair, free opportunity to express their approval or disapproval of its constitution, and that this principle was ignored in the case of her twin-sister, our confidence that Congress will adhere to any policy is not strong. It is the first insidious approaches of power which are to be guarded by a people jealous of its liberties.

I am content to leave this subject here. So little has been said in the long opinion of the majority upon the principle involved in this case, that no good can come of surmising objections which might be urged to our view. I think it clear that the act of Congress imposing the fundamental condition upon us was void.

But it is insisted that the Fourteenth Amendment of the Federal Constitution secures to each citizen the *right* to serve on the jury. If the word " right," as used in that clause, includes jury service, then Crossley was competent, and the exception is not well taken. Let us consider this question.

If we refer to the origin of the institution of trial by jury, we shall find no indication that it was an honor or a right thus to serve litigious parties. In the Saxon and

early Norman times, causes were tried in the County Court; and this tribunal was composed of all the hundredors assembled in a tumultuous and popular body. As the population increased, and the subjects of contention became more intricate and complicated, the practice was resorted to of referring them to twelve, or some multiple of twelve, *liberos et legates homines juratores*, — free and lawful men, sworn to speak the truth. This body was selected from those resident in the vicinity of the matter in dispute, and those best acquainted with the parties and the controversy. They were taken for their personal knowledge of the parties and the dispute. They were taken for the very opposite reason jurors are now selected. They were the witnesses, not simply the judges of the evidence. They were, as witnesses, sworn to speak the truth of the matter before them. They were called because conversant with the circumstances.

This interesting fact explains many circumstances otherwise obscure. There is the expression as to a trial by jury, until recently used in a civil case, and still retained in criminal cases, that a party puts himself upon the country; that is, the county, or men of the county. This is a relic of the ancient jurisdiction of the County Court, where at first the whole body of freeholders were the judges and the jurors, *juratores* were the witnesses, and in which Court the party put himself upon the judges as men of the county. Then, too, there is the expression still retained in our judicial proceedings, "good and lawful men, sworn," &c., which, we have seen, is from the ancient formula. This explains also the fact, very strange to us, that at one time it was a very frequent occurrence to arrest and indict for perjury persons, who, sitting on jurors, rendered a verdict which was disapproved by the court or the king. This was upon the old theory, that the jury found the verdict

according to their own knowledge, and were sworn to speak the truth in finding it; so that, if they did not find a true one, they were guilty of perjury. It also explains the position so powerfully contended for by Erskine, and now adopted into our criminal code, that the jury is the judge of the law and the fact.

That the jury was composed of the witnesses is laid down by many learned historians. Thus Mackintosh, in his "History of England," vol. i. p. 273, says, "There are scarcely any authentic materials for its early history. It seems most probably to have arisen from the confluence of several causes. Perhaps the first conception of it may have been suggested by the very simple expedient of referring a cause by the County Court to a select committee of their number, who were required to be twelve, for no reason or even cause that has been discovered. In civil cases, the obvious analogy of arbitration might have contributed to the adopting of juries. Judges unacquainted with and incapable of a patient inquiry into facts might find it safer, as it was easier, to trust to a sort of general testimony, given by twelve unexceptionable neighbors, on the litigated question. There are many features in this institution which indicate that jurors must, in some manner, have been regarded in the same light with witnesses. Neighborhood, for instance, which might be dangerous to the impartiality of a judge, is advantageous to the knowledge of a witness; and it is still a sort of legal theory, that jurors have the dangerous power of finding a verdict from their own knowledge."

Palgrave, in his "History of the English Commonwealth," vol. i. p. 243, says, "Trial by jury, according to the old English law, was a proceeding essentially different from the modern tribunal, still bearing the same name by which it has been replaced; and, whatever merits be-

BRITTLE v. THE PEOPLE.

longed to the original mode of judicial investigation, —
and they were great and unquestionable, though accompanied by many imperfections, — such benefits are not
to be exactly identified with the advantages now resulting from the great bulwark of English liberty. Jurymen in the present day are triers of the issue; they
are individuals who found their opinion upon the evidence, whether oral or written, adduced before them;
and the verdict delivered by them is their declaration
of the judgment which they have formed. But the
ancient jurymen were not impanelled to examine into
the credibility of the evidence. The question was not
discussed and argued before them: they, the jurymen,
were the witnesses themselves; and the verdict was substantially the examination of these witnesses, who of
their own knowledge, and without the aid of other testimony, afforded their evidence respecting the facts in
question to the best of their belief. In its primitive
form, a trial by jury was therefore only a trial by witnesses; and jurymen were distinguished from any other
witnesses only by customs which imposed upon them
the obligation of an oath, and regulated their number,
and which prescribed their rank, and defined the territorial qualifications, from whence they obtained their
degree and influence in society."

Finalon's note (a) to Reeve's "History of English
Law," ii. p. 541, states the same fact in a few words:
" The law had attached great importance to the trial of
causes by jurors who came from the locality where the
matter arose: for originally they gave their verdicts of
their own knowledge; and even now (in the time of
Henry VI.), when they had tried causes on the evidence of
witnesses of which they were to judge, it was important
that they should come from the place where the witnesses lived, which would be where the matter arose."

BRITTLE *v.* THE PEOPLE.

It was, then, the accident of neighborhood and knowledge that constituted a party a qualified juror. It was not the quality of a citizen or a freeman. It neither gave nor detracted from the honor due to a person called to the service. It was not a right.

If we come down to a later date, when the juror and the witness were separated, and their relations established much as they are now, we shall still see in the position and function of the former that which renders his office, not a right, but a burden, and his duty a service attended by heavy personal risks. The only one of the circumstances which I enumerate is that mentioned above; namely, the liability, in case of reaching a false verdict, or one assumed to be false, to imprisonment and punishment. The situation of affairs out of which this grew is aptly described by Hallam, in his "History of the Middle Ages," vol. ii. p. 404: "Perjury," he says, "was the dominant crime of the middle ages, encouraged by the preposterous rules of compurgation, and by the multiplicity of oaths in the ecclesiastical law. It was the frequency of their offence, and the impunity which the established procedure gave to that of jurors, that produced the remedy by writ of attaint, but one which was liable to the same danger; since a jury on an attaint must, in the early period of that process, have judged on common fame, or on their own testimony, like those whose verdict they were called to revise." Being thus liable to so violent a process in the event of being found to have rendered a false verdict, a juror could hardly have claimed as a right the office, if such it may be called, of adjudging his neighbor's cause. And although this remedy was no longer in use, yet jurors were for a long time subjected to imprisonment when they found a verdict obnoxious to the court or the king. I will not stop to mention

particular instances of such oppressions, but content my-
self with a quotation from Hallam's " Constitutional His-
tory of England," vol. iii. p. 7 : " It is said to have been
the practice in early times, as I have mentioned from
Sir Thomas Smith in another place, to fine juries for
returning verdicts against the direction of the Court,
even as to matter of evidence, or to summon them
before the Star-Chamber. It seems that instances of
this kind were not very numerous after the accession
of Elizabeth ; yet a small number occur in our books of
reports. They were probably sufficient to keep juries
in much awe. But, after the Restoration, two judges,
Hyde and Keeling, successively chief justices of the
King's Bench, took upon themselves to exercise a pre-
tended power which had at least been intermitted dur-
ing the time of the Commonwealth." The last instance
on record of fining a jury for rendering a verdict obnox-
ious to the Court was in 1670, before the recorder of
London, where a fine of forty marks was imposed on
each juror. 6 *State Trial*, 967. One of the jury, being
committed for non-payment of this fine, sued out *habeas
corpus ;* upon which Chief Justice Vaughn held the im-
prisonment illegal. *Vaughn Reports*, 135 ; 6 *State Trial*,
999. It is a curious circumstance, that special verdicts,
and bills of exception, so common in our day, when the
prerogative of juries are so well understood and per-
fectly guarded, were devised by those bodies in those
turbulent days to embody the facts as they found them,
or the rulings of the Court, so as to relieve them of
the necessity of finding a general verdict for which they
could be called in question in so violent and sum-
mary a manner. Such was the burden and the hazard
of a juror down to a comparatively recent day. And
history shows that they were so grievous, that to render
such service could never be deemed a right. It was a

duty which the freeman owed society. It was discharged in the midst of violence and under intimidation, and at great risks.

Our statutes, and those of other States, have uniformly recognized this as the correct view of the subject. Acts are numerous to exempt certain persons from serving on juries. All of those acts recognize the service as a burden, not a right. See an act entitled " An Act to exempt Firemen from Jury, Military, and Road Duty," 1 *State Session Laws*, p. 16. Numerous other acts might be cited to the same effect. The legislature of our own State and of the other States, and the Parliament of Great Britain, have all recognized the service of a juror as a burden which a freeman might be called upon to perform, or be exempt therefrom, as the wisdom of the legislature should determine. The legislature may impose this duty upon one class, and not another. If there was a great number of Chinamen or Asiatics amongst us who were citizens and entitled to the franchise, but ignorant of our language, our laws, our customs, usages, and habits, the legislature might deem it wise to exclude that class from jury service. If they were rejected from such service under the general term " Chinamen " and " Asiatics " by statute, would such statute be obnoxious to the fundamental condition on which Nebraska was admitted into the Union? I think not. If it be a right, it belongs to every elector ; and he may claim his right, and it cannot be denied. The Federal Constitution provides that " the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States." The words " privileges and immunities " have been treated as synonymous with " right."

In *Corfield* v. *Coryell*, 4 *Washington, C. C.*, 371, Mr. Justice Washington, speaking of these words, says, " We

feel no hesitation in confining these expressions to those privileges and immunities which are in their nature fundamental, which belong of right to the citizens of all free governments, and which have at all times been enjoyed by the citizens of the several States which compose this Union."

And in *Conner* v. *Elliott*, 18 *Howard*, 591, Mr. Justice Curtis, delivering the unanimous opinion of the Court, says that these words relate only to the privileges of citizenship.

Webster, in the sixth volume of his works, p. 112, says that these words do not confer political rights. The word "right" in the amendment to the Constitution of the United States refers to those natural rights guaranteed in the Bill of Rights, and not such privileges as may be intrusted to a part of the citizens. This construction is sustained in *Amy* v. *Smith*, 1 *Littel*, 333 ; *Campbell* v. *Morris*, 3 *Har. & McH.*, 554; *Murry* v. *McCarthy*, 2 *Munf.*, 398 ; *Austin* v. *The State*, 592 ; and by Mr. Justice Curtis in *Scott* v. *Sanford*, 19 *Howard*, 580–584. See also *Debates in New-York Constitutional Convention of* 1821, participated in by Mr. Justice Spencer, Col. Young, Mr. Radcliff, and others, p. 183.

That being the meaning of the word in the amendment, there can be no question that it has no relation to this case.

For these reasons, I think that there was error in admitting Crossley as a juror, and that the judgment should be reversed.